# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EARL S. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99 C 3009 |
| | ) | |
| HOWARD PETERS, III, Former Secretary | ) | Judge Rebecca R. Pallmeyer |
| of the Illinois Department of Human | ) | |
| Services, TIMOTHY BUDZ, Former | ) | |
| Facility Director of the Sexually Violent | ) | |
| Persons Unit, THOMAS J. MONAHAN, | ) | |
| Facility Director of the Sexually Violent | ) | |
| Persons Unit, LINDA R. BAKER, Former | ) | |
| Secretary of the Illinois Department of | ) | |
| Human Services, all in their individual | ) | |
| capacities and CAROL L. ADAMS, | ) | |
| Secretary of the Illinois Department of | ) | |
| Human Services, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Earl S. Davis is a civilly committed detainee in the custody of the Illinois Department

of Human Services ("DHS"). Since 1998, he has been housed in the DHS's Treatment and

Detention Facility ("TDF") pursuant to the Sexually Violent Persons Commitment Act, 725 ILCS

207/1. In this suit, Davis claims that the conditions of his confinement violate his constitutional

rights to equal protection and substantive due process. He names the following Defendants:

(1) Timothy Budz, the former facility director of the TDF; (2) Thomas Monahan, the present TDF

facility director; (3) former DHS Secretary Howard Peters, III; (4) former DHS Secretary Linda R.

Baker; and (5) present DHS Secretary Carol L. Adams.[1]

---

[1] Davis is suing Budz, Peters, and Baker in their individual capacities. (4th Am. Compl. ¶¶ 3-9.) The Defendants report that the parties reached an agreement before trial that Davis would voluntarily dismiss Monahan and Adams from the case. (Def.'s Post-Trial Br. at 3 n.2.) Although no dismissal was entered in the record, neither Monahan nor Adams were listed as parties in the agreed Final Pre-Trial Order. (Final Pre-Trial Order [288], at ¶¶ 1-20.) Claims against
(continued...)

Davis alleges that Budz, Peters, and Baker violated his Fourteenth Amendment rights to substantive due process and equal protection of the laws by subjecting him to unjustifiably harsh conditions of confinement. The court has previously granted summary judgment against Davis on his claims that Defendants violated his constitutional rights by providing him with inadequate health care and drinking water, but determined that he was entitled to a trial on his claims regarding harsh security measures. (Minute Entry [310] in Case No. 99 C 2861, June 19, 2007.) Having heard evidence at a bench trial in June 2007, the court finds in Davis's favor in his claim against Budz, and awards him $1,102.50 in compensatory damages on this claim. Davis's claims against Baker and Peters are dismissed.

**BACKGROUND**

The following findings of fact are made pursuant to Federal Rule of Civil Procedure 52(a), based upon the stipulated facts and the evidence presented at trial.

**I.      The Plaintiff's Background**

On June 17, 2007, the day he testified in this case, Earl Davis was sixty-four years old and had been in prison or in civil confinement for most of his adult life. (Tr. at 144.) In 1962, Davis was incarcerated for an unidentified misdemeanor offense[2] for six months at the Vandalia Correctional Center, a minimum security facility managed by the Illinois Department of Corrections ("IDOC"). (Id. at 78, 149.) Starting in either 1962 or 1963, Davis served a 14.5 year term for an unknown crime in Menard Correctional Center, which is an IDOC maximum security facility. (Id. at 81.) After being released from Menard in approximately 1977, Davis was convicted of a crime in Arizona in 1981, where he spent "some time in prisons." (Id. at 73, 150.) He was convicted again in 1990 and

---

[1](...continued)
Defendants Monahan and Adams will be dismissed.

[2]      Because Davis has been confined in the SVP program, it necessarily follows that at least one of these prior offenses involved sexual violence. The parties did not offer evidence as to the nature of Davis's prior wrongs, or how many of his prior convictions involved sexual violence.

spent fifty-five days in Graham Correctional Center, an IDOC maximum security prison, followed by a stint at Centralia Correctional Center, an IDOC minimum security facility. (*Id.* at 149.) Davis was released on parole in 1996, but violated parole the following year, and ended up back at Centralia. (*Id.* at 93, 148-49.) Davis was classified in the least restrictive category—an "A grade" inmate—throughout his time at the IDOC. (Tr. at 93.)

## II.    Davis's Commitment to the TDF

The Sexually Violent Persons Commitment Act ("SVPCA") defines a "sexually violent person" as someone who has "been convicted of a sexually violent offense, . . . adjudicated delinquent for a sexually violent offense, or . . . found not guilty of a sexually violent offense by reason of insanity" and who "suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f). The Illinois Attorney General or an Illinois State's Attorney may bring a civil petition for a determination that an inmate in IDOC custody is a sexually violent person. 725 ILCS 207/15. If the state can prove this beyond a reasonable doubt, that individual may be indefinitely committed "until such time as the person is no longer a sexually violent person." 725 ILCS 207/35-40.

Davis was civilly committed pursuant to the SVPCA and assigned to the first TDF facility, located at the Sheridan Correctional Center ("the Sheridan TDF"), in September 1998. (Stipulation ¶¶ 1-2, 22, Section I of Final Pretrial Order [288] in Case No. 99 C 2861, April 20, 2007.) Budz became the facility director for the Sheridan TDF on January 4, 1999. (*Id.* ¶17.) In 2000, the TDF moved to a new location, an annex to the Joliet Correctional Center ("the Joliet TDF"). (*Id.* ¶ 28.) At the time of trial, Davis was detained at a new TDF in Rushville, Illinois. (Tr. at 74.) As Defendant Budz acknowledged, Davis was not involved in any serious disciplinary proceedings during his time at the TDF. (Tr. at 279.)

## III.    The 1999 Lockdown of the TDF

Budz testified that on October 23, 1999, sixty to seventy detainees were congregated in the yard of the Sheridan TDF, when approximately seventeen of them attempted to organize a collective action of resistance against the TDF staff.  (*Id.* at 348, 351.)  Their plans included work stoppages and a collective refusal to participate in treatment activities. (*Id.* at 348.)  In an effort to gather additional support for this planned resistance, two detainees battered other detainees.  (*Id.*)  According to Budz, the participating inmates were "intimidating residents to refuse to participate in treatment." (*Id.*)  Davis was not among the seventeen participants involved in the disturbance. (*Id.* at 352.)

In order to forestall further violence and protect TDF detainees, Budz, in collaboration with other TDF and DHS personnel, instituted a "lockdown" of the Sheridan TDF, in which detainees were initially confined to their cells for twenty-four hours per day, without access to showers.  (Tr. at 121-22, 352-53.)  After three days of interviews, the TDF staff had determined which detainees had been participants in the disturbance, and Budz modified the lockdown to restore some privileges to the detainee population, including access to showers.  (*Id.* at 351-53.)  Davis admitted that he was allowed to shower on November 1, 1994, nine days after the lockdown began.  (*Id.* at 155.)

The length of the lockdown is disputed.  According to Budz's testimony, Davis remained on lockdown, along with all the other detainees, for an additional seven days after the participants were identified.  (Tr. at 352.)  Davis, by contrast, testified that the lockdown lasted for close to thirty days.  (*Id.* at 122.)  In a report written in mid-November 1999, Budz stated that the lockdown had lasted for a total of twenty-one days, until November 12.  (Morning Report, 11/10/99–11/15/99, at 1, Defs.' Ex. 42.)

## IV. The Escape of TDF Residents Runge and Conley

On October 6, 2000, detainees Paul Runge and Greg Conley escaped while being transported in a van from the Sheridan TDF to a court appearance in Cook County. (Tr. at 252; Monthly Report, 11/1/2000, at 1, Pl.'s Ex. 1 at 0026.) Runge and Conley, along with a third detainee, George Timmons, were traveling to court wearing handcuffs, a waist chain, and leg irons. (Tr. at 252-53.) As a subsequent investigation revealed, TDF staff member Amber Wahler had previously provided Runge and Conley with both a handcuff key and mace spray, items they were able to keep in their possession despite a strip search prior to boarding the van. (*Id.* at 253-55; 258-59; Monthly Report, 11/1/2000, at 1.) Using the handcuff key and mace, Runge and Conley defeated their restraints, escaped from the van, and met with a former TDF staff member, Doris Harper, who provided them with a getaway car, another weapon, and a large sum of cash. (*Id.* at 255-56; Monthly Report, 11/1/2000, at 1.) The Naperville Police Department apprehended Runge and Conley "shortly thereafter." (Monthly Report, 11/1/2000, at 1.) There is no indication in the record as to whether any TDF staff members were injured during the escape.

## V. Response to the Escape: The Black Box Policy

Before the escape, TDF residents being transported for court appearances were restrained by handcuffs, which were bolted to a waist chain, as well as leg irons. (Tr. at 252-53.) Davis found wearing these handcuffs uncomfortable; he had complained to Nurse Renee Vanderlin in June 2000 that these restraints caused him to suffer from swollen wrists and shoulder pain. (Progress Notes, 6/27/00, Defs.' Ex. 39, at 0604.) Vanderlin noted that Davis's wrists were indeed reddened, and prescribed Naproxen. (*Id.*)

Following the escape, Budz, as TDF facility director, was concerned that there might be additional handcuff keys in the possession of TDF detainees. (Tr. at 261.) In his view, TDF staff were incapable of making determinations regarding which detainees were escape risks; he noted

that the staff had not viewed either Runge or Conley as an escape risk at the time they escaped.[3] (*Id.*)  Budz had the facility searched for additional keys.  (*Id.* at 257, 261-62.)  None were located, but Budz still believed that other keys might be hidden within the TDF.  (*Id.* at 262.)  Accordingly, on October 10, 2000, Budz established a policy that all residents were to be restrained by use of a "black box" when being transported.  (Tr. at 260; *see* Memo from Budz to Bukowski, Oct. 10, 2000, Defs.' Ex. 3.)

The black box is a rectangular device measuring approximately four inches by three inches. (Tr. at 129.)  When placed over the chain of a pair of handcuffs, it both limits a prisoner's ability to move his hands, and prevents access to the handcuffs' keyholes.  (*Id.* at 127, 260.)  The following picture provides an illustration of the basic arrangement:



---

        [3]        At trial, Davis emphasized information that he contends should have put TDF staff on notice that Runge might try to escape: In February 1999, Budz was reminded by his security director, Charles Fish, that Runge was "still considered a high escape risk."  (Tr. at 273; Morning Report, 2/5/99, at 1, Pl.'s Ex. 8.)  Budz noted that this assessment had been made a year and a half before the October 2000 escape attempt, and that, based on Runge's cooperative behavior during his time at the TDF, the staff had downgraded its assessment of his escape risk.  (Tr. at 274.)  Budz also admitted, however, that Runge had been restricted to his unit on two occasions, which would normally occur due to misbehavior.  (Tr. at 276.)  Similarly, Budz admitted that Conley had exhibited behavioral problems while in the TDF, including an incident in which he set fire to his room.  (Tr. at 277.)  The court notes that this evidence is not technically inconsistent with Budz's testimony: Budz testified not that neither patient *was* an escape risk (in hindsight, they were obviously escape risks), but rather that, however ill-informed, the staff did not *believe* that they were likely to attempt an escape.  (Tr. at 261.)

HandcuffWarehouse.com, C&S Security Fifth Model Black Box Handcuff Cover, http://www.hand-cuffwarehouse.com/cs5thmoblbox.html (last visited April 16, 2008).

While confined in this device, Davis's hands were restrained in front of his body in a fixed rotation and orientation, making it difficult to eat or use the bathroom. (Tr. at 129-131.) The handcuffs and black box were bolted to an O-ring on his waist chain; Davis also wore leg chains. (Tr. at 144.)

Davis testified that he had been required to wear the device for the entire duration of his trips to court, which he said could last from 10.5 to 16.5 hours in length.[4] (Tr. at 133.) Davis testified that, while wearing the black box, he found it impossible to eat the sack lunches provided for him, and he found it very difficult to use the restroom. (*Id.* at 131.) This difficulty lasted only for about four months, however; on February 13, 2001, Davis obtained an order from the Madison County Circuit Court requiring DHS to remove the black box and handcuffs whenever Davis was at the courthouse, in order to permit him to comfortably use the restroom. (Madison County Circuit Court Order, 2/13/01, Pl.'s Ex. 105.)

Davis did not specifically testify about the number of times he was transported to court between the implementation of the black box policy in October 2000 and the Madison County order in February 2001. He recalled that he traveled to court "every month" for a while, and then later reduced in frequency to "every other month," without explaining when this reduction in frequency occurred. (Tr. at 128.) The record includes a log noting the dates on which detainees were transported to court. (Writ Furlough Log, at 03168-03177, Pl.'s Ex. 99.) These records indicate that Davis traveled to court seven times over the four-month period from when the black box began to be used in October 2000 until he obtained a court order allowing him to take it off in the courthouse. (*Id.*; Madison County Circuit Court Order, 2/13/01, Pl.'s Ex. 105.) The court concludes that Davis

---

[4]     In a December 2001 grievance, Davis gave a slightly lower estimate, stating that his trips lasted from ten to 14.5 hours. (Grievance, 12/6/01, at 1115, Pl.'s Ex. 96.)

was able to urinate and eat his lunch after obtaining this order, given his failure to testify otherwise. Accordingly, the court finds that the black box policy required Davis to endure seven periods of about twelve hours each during which he could not eat or comfortably use the bathroom, all occurring before February 13, 2001.

Although the February 2001 order relieved Davis while he was at court, he continued to wear the black box on his trips to and from court until January 2002. He testified that the combination of handcuffs and black box would chafe the skin on his wrists, that his wrists would sometimes swell, and that his shoulders and arms would ache from being in a fixed position for many hours. (Tr. at 134-35.) He claimed that the combination of his restraints during this period caused him to suffer from pinched nerves in his wrists, causing a persistent loss of feeling in his wrists and hands. (Tr. at 134.) He also claimed that the black box produced "knots" on both of his wrists; he described one of these knots as "a big gristle thing" that "stays ice cold" and lacks sensation. (*Id.*) He stated he suffered from muscle weakness and pain as a result of wearing the black box, causing him to have difficulty picking up objects such as a coffee cup. (*Id.*)

In his December 2001 grievance, Davis asserted that the use of the black box represented corporal punishment, because it caused "great pain in [his] wrists and hands," and reported that he had "a pinched nerve in [his] right wrist [and a] loss of feeling in [his] right thumb and finger." (Grievance, 12/6/01, at 1115; Pl.'s Ex. 96.) An unidentified grievance examiner reported that Nurse Carol Vance stated that Davis "has arthritis and his wrists can swell." (Tr. at 138; Grievance, 12/6/01, at 1119.) Other than this single, third-hand report, there is no other medical evidence confirming Davis's complaints of injuries caused by the black box.[5] Thus, the court finds that Davis

---

[5]      Davis admitted that no doctor had ever linked the knots on his wrists to the black box; he did assert that an unidentified physical therapist had concluded that it was "due to the handcuffs" and that that he thought he had "mentioned the black box" to this therapist (Tr. at 164.) No report by a physical therapist was among the exhibits offered by Davis, however, nor did he call the physical therapist to testify as a witness. The court notes, further, that in a grievance he filed
(continued...)

suffered from chafed and swollen wrists, as well as sore arms and shoulders due to his arthritis, when he was made to wear the black box, but finds that he has failed to prove that he experienced persistent numbness, muscle weakness, or large knots as a result of wearing it. The court notes that the symptoms Davis suffered as a result of the black box were very similar to those he complained of when he was restrained only by handcuffs. (Progress Notes, 6/27/00, Defs.' Ex. 39, at 0604.)

Although the grievance examiner recommended denying Davis's grievance, Budz upheld it on January 7, 2002. (Grievance, 12/6/01, at 1119-20.) Budz ordered that his security staff transport Davis to court appearances without the use of the black box; Davis was to wear only the handcuffs, waist chain, and leg irons that had been standard practice before the escape. (*Id.* at 1120.) This relief was intended to be temporary; Budz also ordered that use of the black box be resumed once a physician confirmed that the swelling on Davis's wrists had decreased or stopped. (*Id.*) There is no evidence, however, that the TDF staff ever did reapply the black box to Davis after Budz sustained this grievance. Furthermore, Budz testified that if his staff had wished to reapply the black box to Davis, they would have had to clear it with him first, and that this never occurred. (Tr. at 716-17.)

The TDF's records regarding detainee transportation to and from court appearances show that Davis made the following trips to court during the time that the black box policy was applied to him:

- October 10-31, 2000: 1 trip.
- November 2000: 3 trips.

---

[5](...continued)
after the black box was discontinued, Davis contended that his handcuffs "were not too tight," but that his new, milder restraints still caused him to suffer from a pinched nerve with attendant numbness. (*See* Grievance, 4/3/02, at 1121, Pl.'s Ex. 97.) At trial, Davis explained that the same symptoms were also caused by the new handcuffs employed by DHS at this time, which he characterized as "double maximum security restraints." (Tr. at 156.) He has not claimed in this litigation, however, that the use of this new type of handcuff system violated his rights.

- December 2000: 2 trips.
- January 2001: 1 trip.
- February 2001: 2 trips.
- March 2001: 1 trip.
- April 1-10, 2001: 1 trip.
- April 11-30, 2001: 1 trip, lasting 8.5 hours.
- May 2001: 0 trips.
- June 2001: 0 trips.
- July 2001: 1 trip, lasting 11.25 hours.
- August 2001: 0 trips.
- September 2001: 0 trips.
- October 2001: 1 trip, lasting 11 hours.
- November 2001: 1 trip, lasting 10 hours.
- December 2001: 0 trips.
- January 2002: 0 trips.

(SVP Writ Furlough Log, at 03168-03199, Pl.'s Ex. 99.) Davis therefore made eleven trips to court during the first six months after Budz implemented the black box policy, and four more trips before Budz upheld his grievance on January 7, 2002. Furthermore, he spent a total of 40.75 hours on these trips between April 11, 2001 and January 7, 2002.

## VI.    Justifications for the Black Box Policy

As described above, Budz, in consultation with his subordinates as well as his superiors, initiated the universal use of the black box for transporting detainees to and from the Sheridan TDF. (Tr. at 251.) The policy was adopted in response to the escape of Runge and Conley, in part, according to Budz, for fear that other handcuff keys might be hidden within the TDF, despite the failure of TDF staff to locate any during a shakedown search. (*Id.* at 260-62.) Budz determined that the policy would be applied universally to all inmates, because "the issue with a handcuff key . . . could make anyone an escape risk," and because the staff "did not believe that either Conley or Runge were an escape risk at that time." (*Id.* at 261.) In fact, Budz testified that, at the early stage in the TDF's operation, they "did not have criteria established to determine who was and was not an escape risk." (*Id.* at 269.) Budz admitted that it was possible to identify those TDF detainees who had high psychopathy scores, (*id.* at 279), but he explained his conclusion that this information was insufficient to predict an escape:

10

> [W]ith the population that we receive at the TDF, and this is a generalization, where they have high psychopathy scores, indicating their callous disregard for the welfare of others, they are generally not the type of person that will—that looks like the Conley who is beating people up, who are setting fires to the room. It's—they're working below the surface. So it's more difficult to determine who is planning or plotting something like the Runge who had this entire escape plan plotted without us being able to determine that was actually happening. So it wasn't because of Runge, but it was because of that type of resident who we knew were part of the facility.

(Tr. at 278-79.) Budz also testified that it was his understanding that the detainees in his custody represented the "five percent of all of the sex offenders who were deemed to be the worst of the worst sex offenders in the State of Illinois . . . ." (Tr. at 718.) Budz testified that he considered several alternative options which he rejected in favor of implementing the black box policy. (Tr. at 717.) One option, bringing in a private security firm with armed officers to escort the detainees to court, was rejected for unspecified reasons. (*Id.*) Budz concluded that securing detainees with their hands behind their backs during transport would be even more restrictive than the black box. (*Id.*)

Budz implemented the black box policy on October 10, 2000. (Tr. at 251.) As discussed above, Budz ordered that the policy be suspended as to Davis on January 7, 2002. (Grievance, 12/6/01, at 1119-20.) The policy remained in effect for the remainder of the population at the Joliet TDF until August 31, 2004. (Tr. at 262-63; *see* Stipulation ¶ 28.) At that time, a class action lawsuit was being pursued by a group of TDF detainees (which did not include Davis), seeking to change a number of TDF policies relating to confinement conditions and treatment policies. *See Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300, at *1-3 (N.D. Ill. Jan. 14, 2005). Shortly before the *Hargett* trial was set to begin, Budz limited the use of the black box to new detainees, detainees with a history of major rule violations, and detainees who, in the staff's judgment, presented a serious risk of escape. (Tr. at 262-63, 268; Memorandum from Budz to Sanders, 8/31/04, Pl.'s Ex. 82.) Approximately twelve to fourteen detainees fell into any of these categories at the time this policy was implemented, out of a total of 177-178 detainees at the TDF. (Tr. at 553.) In other

words, once an individualized policy was put into place, fewer than 8% of the TDF's residents were required to wear the black box.

Two expert witnesses testified regarding the use of black boxes in SVP detainment programs. Plaintiff's expert, Steve Martin, is a former corrections officer. (Tr. at 383.) After obtaining a law degree, Martin worked as a federal probation and parole officer, and then as general counsel of the Texas prison system; he later served as a special assistant attorney general responsible for litigation involving the prison system in Texas. (*Id.*) Since the late 1980s, he has worked in private practice, focusing primarily on corrections litigation; during this time he has frequently served as a consultant, in which capacity he has reviewed security procedures at numerous prisons, and served as a court-appointed neutral monitor in cases involving prisons in New York, Arizona, and Mississippi. (*Id.* at 384-86.) Martin admitted that he had never worked at a treatment and detention facility similar to the TDF, and that his "background and experience [was] not with [SVP] facilities." (*Id.* at 418.)

Martin testified that he "would not second guess" the decision to apply the black box to all inmates during transport in the immediate aftermath of the escape incident. (Tr. at 395-96.) He could not perceive any legitimate reason for the black box to be universally applied over a four-year time span, however. (Tr. at 396.) He testified that there would need to be "some articulable basis" to continue it past a "six-month period," and explained that the policy was unreasonable as applied to Davis because no such basis had been articulated. (Tr. at 400-01.) Without specifically addressing Budz's claimed suspicions that other detainees might possess a hidden handcuff key, Martin testified that he was unaware of any other detention system in which a black box is applied to all detainees, "irrespective of custody or management or security needs," even including "supermax" prisons within this statement. (*Id.* at 401-03.) In fact, he testified that, although there are more than 65,000 inmates in the New York state prison system, authorities there applied the black box to fewer than 100 "red tag" inmates, so classified because they were "immediately

dangerous folks." (*Id.* at 401-02.)

Defendants' expert witness, Dr. Joel Dvoskin, holds a Ph.D. in clinical psychology.  (Tr. at 575.)  Early in his career, he worked as a counselor for prison inmates with psychological issues. (Tr. at 576-77.)  He later served as chief psychologist for the Arizona State Prison Complex at Tucson in the early 1980s.  (*Id.*)  In that capacity, he designed treatment programs for inmates with a history of sexually violent behavior.  (*Id.* at 577-78.)  He next served as the director of forensic services for the Virginia Department of Mental Health, Mental Retardation, and Substance Abuse; he eventually became the director of mental health for that Department.  (*Id.* at 579.)

In 1984, Dvoskin became the director of forensic services for the New York State Office of Mental Health; this position involved overseeing multiple psychiatric facilities.  (*Id.*)  At one point during his tenure there, he temporarily served as the primary manager of an individual forensic psychiatric facility—that is, a facility that houses both patients found not guilty of a serious crime by reason of insanity or incompetent to stand trial, and patients transferred from civil hospitals because they are difficult to manage. (*Id.* at 619.)  Dvoskin was acting commissioner of mental health for the State of New York for a six-month period in 1995, and since then has worked full-time as a practitioner and consultant on mental health and correctional issues, frequently testifying as an expert witness regarding conditions of confinement in prisons, psychiatric hospitals, and jails. (*Id.* at 580-82.)

Dvoskin testified that, as a general matter, it is common for security measures to be universally applied to inmates or detainees, in order to avoid conflicts arising from perceptions of inequitable treatment.  (Tr. at 593.)  He also testified that imposing the black box policy was a reasonable response to the escape of Runge and Conley.  (*Id.* at 609.)  He believed that, although no restraint system is foolproof, the black box would probably have defeated a similar escape attempt.  (*Id.*)  He testified further that the black box would reduce the likelihood that another escape attempt would succeed, even with the assistance of TDF staff, because the box could not

13

be removed surreptitiously. (*Id.* at 610.) Dvoskin noted that there is no standard duration for security measures like the black box policy following an escape; rather, such calls must be made based upon a particularized assessment of security needs over time. (*Id.* at 611-12.) At no point did Dvoskin conclude that use of the black box over a fifteen month period would fall within the bounds of professional judgment. (*Id.*)

Dvoskin testified that he was not sure whether or not he would have applied a similar policy had he been in Budz's place. (Tr. at 609.) He acknowledged further, that although he had visited more than half of the forensic hospitals in the United States over the course of his career, he was unaware of any such hospital that universally applies a black box system during patient transportation. (*Id.* at 624-25.) Dvoskin has given expert testimony regarding SVP detention programs in three other states—California, New Jersey, and Washington—and, although he does not remember asking, he is not aware that any of those programs use the black box on detainees. (*Id.* at 625-26.) To Dvoskin's knowledge, the Joliet TDF was the only SVP detention facility employing a universal black box policy. (*Id.* at 626.)

**VII.    Ongoing Evaluations of the Black Box Policy**

Budz testified that TDF managers "continued to look at all of [their] policies and procedures and practices . . . in a continuous quality-improvement capacity," and the black box policy was one such area under continual scrutiny. (Tr. at 333.) According to Budz, there were "years of discussion" regarding the black box policy. (Tr. at 291.) Robert E. Glotz, the former security director for the Joliet TDF, likewise testified that he reevaluated the use of the black box "on a regular basis." (Glotz Dep., 6/12/03, at 92:19-93:1.) The only document addressing the policy, however, is Budz's 2004 memorandum rescinding it. (Tr. at 359.)

In 2004, Darrell Sanders began serving as the security director of the Joliet TDF. (Tr. at 544.) Sanders testified that he "questioned the necessity" of applying the black box to the entire TDF population. (*Id.* at 549.) Accordingly, he recommended to Budz that the policy be made more

14

individualized. (*Id.* at 550-51.) According to Budz, the decision to amend the black box policy arose "primarily with Mr. Sanders' beginning appointment," although it also involved input from other DHS personnel. (Tr. at 333.) The actual policy reversal, however, occurred very shortly before the trial of the *Hargett* case, which included a claim for injunctive relief against further use of the black box. (Tr. at 262-63, 268; Memorandum from Budz to Sanders, 8/31/04, Pl.'s Ex. 82.) *See Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300, at *4 (N.D. Ill. Jan. 14, 2005).

## VIII. The Strip Search Policy

When the TDF was located at Sheridan from 1998-2000, DHS and IDOC entered into an interagency agreement concerning the use of a part of the Sheridan Correctional Center, a medium-security prison, as a TDF for the purpose of housing SVPCA detainees. (1998 Interagency Agreement at 1, Pl.'s Ex. 108.) Budz, who ran the TDF when it was located at Sheridan, testified that "it was a requirement that we follow all DOC policies within that secured facility." (Tr. at 326.) Budz himself did not identify what provision of the Interagency Agreement imposed such a requirement, but the court notes a provision making DHS employees "subject to all DOC polices and procedures covering operations of the facility." (1998 Interagency Agreement at 2.) One such policy, according to Budz, was a rule requiring strip searches of IDOC inmates before and after inmates visited with family or attorneys, as well as before and after they traveled to court appearances. (Tr. at 327.) According to Budz, this policy was an "unwritten practice" not reflected in the IDOC administrative code. (*Id.* at 355-56.) The interagency agreement did explicitly require searches before and after visits, but did not specify that these must be strip searches. (1998 Interagency Agreement at 7.)

Budz's testimony regarding the "unwritten practice" of strip searching within the IDOC was partially corroborated by Gerald Buscher, who held the title of Operations Security Director within the IDOC. (Buscher Dep. at 4:14-19.) In a deposition given in early 2007, Buscher testified that a policy had been in place for the preceding eighteen years, under which IDOC inmates were strip

searched, including a visual inspection of body cavities, before and after visits with attorneys or family members. (*Id.* at 17:11-19.) During such searches, inmates were required to "strip completely" and present all their clothing for examination. (*Id.* at 18:6-11.) Then, the inmate was required to run his fingers through his hair, to open his mouth and move his tongue around, to raise his arms so as to expose his armpits, to lift his scrotum, to spread his buttocks so as to reveal his anus, and to raise each leg so that the soles of his feet and the area between his toes could be inspected. (*Id.* at 18:12-24.) According to Buscher, this procedure was applied even to minimum security prisoners within the IDOC. (*Id.* at 19:2-9.)

Before becoming DHS Secretary, Peters had worked in the IDOC over a twenty-four year period as a warden at Centralia, Sheridan, and the Pontiac Correctional Center, and also as the Director of the IDOC until 1995. (Tr. at 193, 196.) To Peters's best recollection, during the time he was warden at Centralia from 1984 through 1986 and at Sheridan from 1986 through 1988, strip searches were not routinely conducted before prisoners met with their family members or attorneys. (*Id.* at 200-02.) Peters was unsure whether prisoners at Sheridan were strip searched after visits with family members, although he testified at his prior deposition that he "[didn't] believe" that to be the case. (*Id.* at 202.) Peters acknowledged the possibility that there were procedures at the local or administrative level regarding strip searches of which he was not aware during his time as IDOC Director, and that individual facilities had authority to establish a policy requiring all inmates to undergo strip searches. (*Id.* at 215.) He also testified, however, that if a policy requiring strip searches before and after visits had been proposed to him, he would have not approved it. (*Id.* at 213.)

Based on his belief that he was obliged to do so, Budz did require all detainees at the Sheridan TDF to be strip searched before and after visits with guests and trips to court. (Tr. at 357.) When the TDF moved to its new, stand-alone home in Joliet in March 2000, Budz knew he was no longer required to continue this policy, but he chose to do so on an "interim" basis, "given [that] this

[was] the first time that the sexually violent persons program had broken away from the [IDOC]." (*Id.* at 357.) At no time did the TDF staff find weapons or drugs as a result of the strip search policy; the only contraband ever found was paper and pens. (Tr. at 301.) Budz, however, believed that the absence of major contraband was a result of the deterrent effect of the strip search policy. (*Id.* at 305.)

As Plaintiff Davis described the practice, TDF officers would begin a strip search by requiring him to remove all of his clothing, which they would "shake down." (Tr. at 117.) Next, they would order him to shake out his hair and beard, to lift his testicles, to pull back the foreskin of his penis, to lift his feet to display the soles, and to spread his buttocks to expose his anus. (*Id.*) Davis testified that this procedure sometimes occurred in the presence of female TDF staff, although he "couldn't quote how many times." (*Id.*) There was no evidence of any policy permitting female officers to conduct or observe strip searches of male detainees, however; Budz testified that he did not know female staff were present during strip searches, and would have instructed his staff to forego the strip search of a male detainee rather than permit a female officer to conduct it. (*Id.* at 719.)

The strip search policy continued until September 2004, when the TDF acquired a "Rapiscan 1000," a device which enabled staff to determine whether detainees were carrying items under their clothing without requiring the detainees to disrobe. (*Id.* at 295, 297.) In a Facility Directive dated November 22, 2004, Budz directed all TDF staff to use the Rapiscan for all future searches. (Facility Directive, 11/22/04, at 3, Pl.'s Ex. 75 at 0603322.) This directive made no mention of any requirement of scanning detainees before visits. (*Id.*) The November 2004 directive authorized strip searches only with the permission of the Security Director, or when the Rapiscan detected contraband. (*Id.* at 4.) Davis claims that he endured several strip searches even after the introduction of the Rapiscan machine, most as a result of temporary breakdowns in the Rapiscan machine. (*Id.* at 156-57.) He claims further that he was strip searched on one occasion even after

being scanned by the Rapiscan machine, following a visit with his attorneys, (*id.* at 157-58), but he could not identify the date when this took place.

Davis offered no testimony as to the total number of attorney or other guest visits he had between March 2000 and September of 2004. He mentioned being strip searched before meeting with attorney Everett Cygal, before meeting with an individual named Lincoln Schroth (phonetic spelling), and before meeting with attorney Joshua Lee. (Tr. at 114-15.) It is unclear whether these were multiple visits or a single visit, and it is similarly unclear whether the incident(s) occurred at the Sheridan TDF or at the Joliet TDF; although Davis testified that he was strip searched while at the Joliet TDF, he did not say whether this was in connection with guest visits or only with his trips to court. (*Id.*) Thus, although Davis argues that he has been subjected to "hundreds of body cavity searches"[6] (Pl.'s Post-Trial Br. at 10), he failed to offer evidence regarding how many of these searches were in connection with visits.

Plaintiff's expert, Steve Martin, acknowledged that strip searches are "a common part of correctional administration." (Tr. at 392.) He is unaware, however, of any institution that universally conducts strip searches and visual cavity inspections of general population inmates or residents in a secured facility before and after every guest visit. (*Id.* at 393.) Instead, such a practice is normally implemented via a written policy that provides for a "narrowing of circumstances" in which such intrusive searches would be permitted. (*Id.*) Martin acknowledged that a universal strip search policy might be appropriate "when [detainees] leave the institution and pass through the civilian personnel and community" or whenever "there is an articulable immediate correctional security rationale to do it at that moment." (*Id.* at 393-94.) Requiring a strip search after every guest visit

---

[6] In support of this assertion, Davis cited his own testimony that he was strip searched before and after every court trip at Sheridan and at Joliet, which did not include any testimony as to how many times he was searched in connection with guest visits. (Tr. at 114-15; Pl.'s Post-Trial Br. at 10.) He also cites TDF records; these records, however, only provide evidence as to the number of court trips he went on, not the number of visits he received. (*See* SVP Writ Furlough Log, Pl.'s Ex. 99.)

might be justified, depending on "whether it's a contact or non-contact visit [as well as] what type of surveillance that you have in your visiting area." (*Id.* at 399.) Martin could identify no reason why detainees at the TDF should be universally searched *before* meeting with guests at the institution, however. (*Id.* at 395, 399.)

Finally, after reviewing Davis's records, Martin characterized Davis as "the type of inmate that correctional managers . . . find beneficial to have as a resident." (Tr. at 396.) He further testified that nothing in Davis's record suggested a risk that he would assault a staff member or a high risk that he would attempt an escape. (*Id.* at 398-99.) Accordingly, Martin concluded that, by applying the universal strip search policy to Davis, the Joliet TDF violated accepted practices and standards within the security and corrections professions. (*Id.* at 400.)

Defendants' expert, Joel Dvoskin, testified that applying a policy universally, even to some detainees who were well-behaved, could sometimes be justified by a desire to avoid conflicts over perceived inequitable treatment. (Tr. at 593.) In Dvoskin's view, a universal strip search policy can be an important means by which to keep weapons out of a detention facility. (*Id.*) He believed that strip searches of detainees entering a facility are "common" in secure forensic facilities, and that "some places search before trips also." (*Id.* at 596-97.) In his words, "[a]nytime one leaves the facility . . . they are in the company of staff, and you want to make sure you keep your staff safe." (*Id.* at 597.) Similarly, he testified that some forensic hospitals search patients after visits with guests, out of concern that the guests may introduce contraband into the facility. (*Id.*) By contrast, he, like Martin, was not aware of any facility that strip searched residents before guest visits. (*Id.*) Furthermore, although he testified that strip searching before and after visits was within the bounds of professional judgment, he was quick to emphasize that "[he] wouldn't have done it." (*Id.*) In fact, on cross-examination he admitted that a strip search before a visit "would have been a very unusual event that would have definitely been for cause." (*Id.* at 623.)

## IX. Overnight Illumination of TDF Cells

At the Joliet TDF, Davis's cell had a security "night-light," which remained on from the time the main lights were turned off until they were turned on again in the morning. (Tr. at 108-09.) Davis testified that, between the night-light and the lighting filtering in from the corridor and from the spotlights in the yard, "[i]t was so bright [that he] could read the small print in one of those little Bibles at night without turning a light on." (*Id.* at 109.) Budz, by contrast, described the night-light as a "small, low-wattage bulb." (*Id.* at 346.) He testified that the light allowed security staff to monitor the detainees' rooms at night by looking through plexiglass windows in the doors. (*Id.* at 350.) He explained that such monitoring was necessary to ensure that detainees remained in their rooms and refrained from inappropriate sexual activity. (*Id.*)

Davis claimed that, when he tried to use a washcloth to cover his eyes while he was sleeping, a TDF staff member named Andreas Cobb instructed him to remove it. (*Id.* at 111-12.) He did file a grievance on June 21, 2001, regarding an incident involving Cobb. (Grievance, 6/21/01, at Pl.'s Ex. 92.) This grievance, however, states that Cobb instructed him to remove a towel hanging down from an upper bunk, which was concealing a portion of his lower bunk. (*Id.* at 1-2.) There is no indication in that complaint that she denied him permission to cover his face. (*Id.*) Indeed, Budz testified that TDF staff had provided night masks to residents who requested them, so that they could cover their eyes while sleeping. (Tr. at 381.)

## X. Peters's Involvement in TDF Policymaking

Howard Peters became Secretary of DHS in 1997, and remained in this position until December 31, 1999. (Tr. at 194, 197-98.) As Secretary, Peters oversaw all the mental health facilities under the DHS umbrella, including the TDF, which was launched during his tenure in office. (*Id.* at 211-12.) There were four or five levels of management between Peters and the TDF facility director. (*Id.* at 216.) Peters gave unrebutted testimony that he was never involved in developing policies or procedures applicable to the Sheridan TDF while he was Secretary. (*Id.* at 218.) Although he did visit the Sheridan TDF on one occasion, Peters was not made aware of any policies relating

to the strip searching of TDF detainees, and did not even learn of the TDF strip search policy until he gave a deposition shortly before the trial of this case. (*Id.* at 198, 218-19.)

Peters approved the interagency agreement between IDOC and DHS, which required DHS to "search [TDF] residents prior to and upon exit from the visiting area." (Tr. at 224-25; Interagency Agreement, 2/26/98, at 7, Pl.'s Ex. 108.) Peters did not believe that the agreement required strip searches. (Tr. at 226.)

## XI.     Baker's Involvement in TDF Policymaking

Linda Baker served as Secretary of DHS from 2000 until February 2003. (Tr. at 449-50.) Like Peters, Baker testified that she had no knowledge of any specific TDF policies, including the black box or strip search policies. (*Id.* at 507-08, 515-16.)

Baker explained that there is a mail-sorting system set up to help the Secretary of DHS handle her correspondence. (Tr. at 466.) Four to six employees sort through 2,000 or more pieces of mail on any given day, all of which are addressed to DHS officials, including the Secretary. (*Id.* at 467-68.) These employees then route incoming mail to the office or offices whose attention is required in order to provide a response. (*Id.* at 468-69.) This mail system was in place well before Baker became Secretary. (*Id.* at 517-18.)

Baker's primary involvement with the TDF arose in the context of the Governor's Treatment and Detention Task Force. (Tr. at 484-85.) The Task Force was set up to address the problem of overcrowding in the Joliet TDF and the potential constitutional concerns that could arise out of that overcrowding. (*Id.* at 485, 499.) There was no evidence, however, that the Task Force conducted any review of the security procedures employed at the TDF. In connection with the Task Force's mission, Baker visited the Joliet TDF and received a tour of the facility on two occasions. (*Id.* at 512.) Her purpose in both of these visits was to gather information relating to the feasibility of expanding the Joliet facility; there was no discussion of security policies or practices during these visits. (*Id.* at 513-14.)

In an effort to impeach Baker's testimony that she had no knowledge of the TDF's security policies, Davis offered two of his own prior grievance forms listing Baker on the "cc" list. (Tr. at 455, 501.) One of these grievances related to the black box policy. (Grievance, 12/6/01, at 3, Pl.'s Ex. 96.) In the second grievance, Davis complained of allegedly improper strip searches and confiscation of his legal materials. (Grievance, 7/19/01, at 1-2, Pl.'s Ex. 88.) Budz replied to the grievance in a document titled "Grievance to Secretary Baker dated July 24, 2001," in which Budz explained that "Secretary Baker has asked me to respond to your grievance copied to her from July 25, 2001." (Memo from Budz to Davis, 8/11/01; Pl.'s Ex. 88.) Although this document, too, is marked with a "cc" to Baker, she testified that she had not discussed this grievance with Budz, and had never seen any grievances from the TDF detainees. (Tr. at 453, 456-57.) Instead, she testified that grievances such as this were typically rerouted by her mail control service to the Office of Mental Health, which had more direct responsibility over the TDF program. (*Id.* at 462-63.)

Davis also offered into evidence a monthly report in which Budz made the following comments:

> Residents continue to write to everyone and anyone that will listen. I once again have at least 7 secretary controls[7] to respond to. Although, the Secretary now understands that she should not respond directly, the letters are still being routed to me for a response.

(Monthly Report, 7/1/01, at 4, Pl.'s Ex. 1.) The court notes that this Report was written several weeks before the earlier of the two grievances that Davis had copied to Baker.[8] (Grievance, 7/19/01, at 1-2, Pl.'s Ex. 88.)

---

[7]    The parties have not explained the meaning of this term to the court.

[8]    Although Davis offered this statement into evidence, he has not made clear the manner in which he believes it supports his case. As the court understands Budz's statements, he is suggesting that beginning in July 2001, Baker did not read any grievances, and that grievances addressed to Baker were instead routed to Budz. Those circumstances support Baker's contention that she had no knowledge of the two grievances Davis copied to her.

**DISCUSSION**

Davis argues that Budz, Peters, and Baker violated his substantive due process right to adequate conditions of confinement, as well as his equal protection right not to be treated less favorably than a convicted felon. (Pl.'s Post Trial Br. at 3.) Davis argues that his conditions of confinement were constitutionally inadequate in the following ways: (1) the TDF staff classified him as a "Maximum-Custody Inmate," (2) the TDF staff forced him to submit to frequent and invasive strip searches, (3) the TDF staff forced him to wear the black box restraint system during his trips to court, and (4) the TDF staff subjected him to continuous illumination during his sleep periods. (*Id.* at 9-10, 12, 14.) Peters and Baker argue that Davis has failed to show that they had any personal involvement in creating the conditions of Davis's confinement. (Defs.' Post-Trial Br. at 5.) All of the Defendants deny that the practices at the TDF violated Davis's rights, and all maintain that they are protected by the doctrine of qualified immunity. (*Id.* at 7-20.)

**I.      Peters's Liability for TDF Security Policies**

Liability under 42 U.S.C. § 1983 is predicated on fault; therefore, a supervisor will not be liable for a subordinate's conduct unless the subordinate either acted at the supervisor's direction, or acted with the supervisor's knowledge and consent. *Hildebrant v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). In the absence of proof that the supervisor knew about the conduct at issue, he will not be liable. *Id.*

Peters testified that he had no knowledge of any TDF security policies or practices during his tenure as Secretary. (Tr. at 218-19.) This testimony was both credible and unrebutted. Davis contends that Peters must have had knowledge of the strip searching, because he signed an interagency agreement requiring Sheridan TDF detainees to be searched before and after visits. (Pl.'s Post-Trial Br. at 17; Tr. at 224; Interagency Agreement, 2/26/98, at 7, Pl.'s Ex. 108.) This agreement only required residents to be searched, however; it said nothing regarding strip searches, and Peters testified that he did not understand it to require strip searches. (Interagency Agreement,

2/26/98, at 7; Tr. at 225-26.)  In fact, Peters testified that he would not have authorized a policy requiring TDF detainees to be strip searched both before and after visits.  (Tr. at 213.)  Thus, because Davis has failed to establish that Peters knew that residents at the TDF were subject to strip searches, Peters is not liable for any constitutional infirmities in the security policies at the TDF.

## II.    Baker's Liability for TDF Security Policies

Baker, too, contends that she lacked the personal involvement necessary to support § 1983 liability.  (Defs.' Post-Trial Br. at 5-6.)  Davis insists that Baker did know of the TDF policies, and that even if she did not, she is liable for maintaining willful ignorance of those policies.  (Pl.'s Post-Trial Br. at 17-18.)

The evidence adduced at trial does not support Davis's claim that Baker knew of the TDF's security policies, including the black box policy and the strip search policy.  She testified credibly to the contrary.  (Tr. at 507-08, 515-16.)  Indeed, it would be surprising for Baker, as the Secretary in charge of a state-wide bureaucracy, to know the operational details of one facility, from which she was separated by four or five layers of mid-level managers.  (Tr. at 216.)  As evidence that Baker did know such details, Davis points to Budz's comment that "Secretary Baker has asked me to respond to your grievance" (Letter from Budz to Davis, 8/11/01, Pl.'s Ex. 88), but this comment, by itself, is insufficient to meet Davis's burden; Budz may have been using the term "Secretary Baker" to refer to her office or to one of her departmental subordinates.  This explanation is more probable than the alternative hypothesis that Baker was lying regarding her knowledge, in light of her credibility as a witness, the size of her department, and the absence of any direct evidence of her involvement in TDF policymaking.

Davis contends that Baker may nevertheless be liable under § 1983 for negligently failing to apprise herself of the TDF's security procedures.  (Pl.'s Post-Trial Br. at 17-18.)  Section 1983 may create liability if a superior official willfully insulates herself from knowledge of constitutional violations by subordinates.  *Powell v. Godinez*, No. 93 C 3469, 1997 WL 603927, at *5 (N.D. Ill.

Sept. 24, 1997) (quoting *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) for the proposition that "[g]oing out of your way to avoid acquiring unwelcome knowledge is a species of intent"). Thus, if Baker suspected that constitutional violations were occurring in the TDF, but used a mail sorting scheme in order to avoid learning any details, this ostrich-like behavior might satisfy the requirement that a supervisor can be liable for "know[ing] about the conduct . . . [and turning] a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citation omitted); *McGill*, 944 F.2d at 351.

To prevail under the ostrich theory, however, Plaintiff must present evidence that a supervisor suspected that something was wrong and deliberately avoided knowledge of it; an officer cannot be liable for "failure to alleviate a significant risk that he should have perceived but did not" because such a situation does not involve "actual knowledge of a substantial risk of serious harm." *Haley v. Gross,* 86 F.3d 630, 640-41 (7th Cir. 1996) (citations and emphasis omitted); *see Agrawal v. Briley*, No. 02 C 6807, 2004 WL 1977581, at *13 (N.D. Ill. Aug. 25, 2004) (finding no basis for liability when defendant delegated responsibility to review grievances to subordinates, in the absence of evidence that he knew or suspected that those subordinates were not responding appropriately); *Powell*, 1997 WL 603927, at *5 (granting summary judgment in favor of warden who was not intentionally ignorant of prisoner complaints); *cf. Goodman v. Carter*, No. 00 C 948, 2001 WL 755137, at *5-6 (N.D. Ill. July 2, 2001) (denying summary judgment, because a jury could infer that a warden, who is given statutory responsibility for responding to grievances, was deliberately turning a blind eye to prisoner complaints by delegating grievance responses to unnamed subordinates); *Felton v. Godinez*, No. 93 C 4584, 1997 WL 610050, at *2 (N.D. Ill. Sept. 26, 1997) (denying summary judgment, became a reasonable jury could infer a supervisor's knowledge from receipt of a letter). *But see Birch v. Jones*, No. 02 C 2094, 2004 WL 2125416, at *7 (N.D. Ill. Sept. 22, 2004) (stating that "[t]hose signing a warden's name effectively act as his agent[s] and their actions are accordingly attributable to him," without distinguishing Seventh Circuit caselaw rejecting *respondeat*

*superior* liability in § 1983 cases).

Davis claims that it was improper for Baker to "avoid responsibility by delegating it [] and by not reading her mail." (Pl.'s Post-Trial Br. at 17.) To the extent that Davis is arguing that Baker's use of a mail-sorting system was a bad faith attempt to avoid learning of constitutional violations by DHS subordinates, such a suggestion finds no support in the record. Indeed, it would be impossible for a government official such as Baker to personally review the "2,000 pieces of mail or more in a day" that DHS receives. (Tr. at 467.) Davis has failed to prove that Baker both suspected something was wrong at the TDF, and intentionally used her mail system to avoid learning about it. For this reason, his claim against her cannot succeed.

## III.    Budz's Liability for an Equal Protection Clause Violation

The court thus turns to Davis's claims against Budz. Davis claims that Budz violated the Equal Protection Clause by depriving TDF detainees of their fundamental rights. (Pl.'s Post-Trial Br. at 9.) Equal protection claims generally fall into three categories. In the first category are claims that a state has improperly discriminated on the basis of "suspect classifications" such as race, alienage, or national origin, as well as claims that a state has deprived the members of any class of persons of a fundamental right. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Both of these types of claims are analyzed under a "strict scrutiny" standard, meaning that the state action will be struck down unless it is "suitably tailored to serve a compelling state interest." *Id.* In the second category are claims that the state has discriminated on the basis of "quasi-suspect" classifications such as gender or illegitimacy; such claims are analyzed under an intermediate scrutiny framework, meaning that the state discrimination will be struck down if it is not "substantially related to a sufficiently important government interest." *Id.* at 437-38, 441. In the third category are claims of discrimination that involve neither suspect or quasi-suspect classes nor the denial of fundamental rights. *Id.* at 441. Such discrimination can be struck down only if it does not constitute a "rational means to serve a legitimate end," under the less-demanding rational basis test.

*Id.* at 439-40, 442.

Because freedom from bodily restraint is a fundamental right, the portion of Davis's equal protection claim alleging excessive restraint is subject to strict scrutiny. *See Youngberg v. Romeo*, 457 U.S. 307, 319-20 (1982); *Barichello v. McDonald*, 98 F.3d 948, 953 (7th Cir. 1996). *Youngberg* specifically confined its application to the right to "freedom from bodily restraints" and the right to safety, however. 457 U.S. at 319-20; *see Barichello*, 98 F.3d at 953 (recognizing that *Youngberg* is so limited). Thus, it is doubtful that Davis's challenges to the strip search policy or to the nighttime illumination of his cell likewise implicate fundamental rights. The court need not resolve this question, however, because all of Davis's equal protection claims fail even under the strict scrutiny standard.

To establish an equal protection claim under the strict scrutiny standard, Davis must first show that a group of which he is a member was treated differently than another, similarly-situated group, and that the Defendants engaged in this disparate treatment because of that group membership.[9] *Chavez*, 251 F.3d at 635-36; *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992). If Davis can make this showing, the burden then shifts to the defendants to show that the governmental decision to treat the two groups unequally was narrowly tailored to facilitate a compelling state interest. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 637 (7th Cir. 2007).

Davis has failed to show that a similarly-situated class of people was treated differently than the SVP detainees. The identification of a similarly-situated class in the equal protection context "depends on the context of the case"; it is an "essentially factual" inquiry that is grounded in common sense. *Chavez*, 251 F.3d at 636 (citation omitted). Davis suggests that "prisoners" or "Convicted

---

[9] Davis has not asserted a "class of one" equal protection claim, which would in any event be subject only to rational basis review; his claim is predicated on his membership in the class of "mental health patients." (Pl.'s Post-Trial Br. at 9.)

Felons Serving Time" are a similarly-situated class. (Pl.'s Post-Trial Br. at 8-9.) In the court's view, however, a detainee in the SVP differs from a generic "felon" in the IDOC in a number of ways. Each has been found guilty of "sexually violent offenses," and each has been determined to be likely to engage in further acts of sexual violence. 725 ILCS 207/5(f); *see id.* at 207/35 (requiring proof of these facts beyond a reasonable doubt as a precondition to SVP detention). Budz further testified that individuals within the SVP program typically have "high psychopathy scores, indicating their callous disregard for the welfare of others," and that they represent the "five percent of [those] deemed to be the worst of the worst sex offenders in the State of Illinois . . . ." (Tr. at 278, 718.) IDOC inmates who are deemed similarly situated to TDF detainees must be limited to those who have been found guilty of violent offenses and who are considered likely to harm others.

Unfortunately for his equal protection claim, Davis has offered almost no evidence of the typical security procedures applied to those inmates who would be considered among the more dangerous offenders in the IDOC. There is nothing in the record indicating the frequency with which dangerous offenders are subjected to the black box system when being transported, to strip searches, or to night-time illumination of their sleeping quarters.

Davis did offer some recollections regarding his prior terms of incarceration, stating for instance that he had never been subjected to the black box system while in the IDOC (Tr. at 163), but the court concludes this falls short of the mark. First, Davis was last incarcerated in 1998; the relevant comparison, however, would be with sexually violent inmates between 1999 and 2004. More importantly, Davis was classified in the least restrictive category—an "A grade" inmate—throughout his time at the IDOC. (Tr. at 93.) Although this indicates that Davis himself was a cooperative inmate, it says little about the propriety of security procedures for a class of violent sex offenders. Third, some of his testimony was contradicted by other witnesses. For instance, he testified that he was never subjected to a full strip search before an attorney visit while in IDOC custody. (Tr. at 119.) Budz and Boucher, however, testified that the Sheridan Correctional Center,

a medium-security prison, had a practice of subjecting all inmates to strip searches before and after visits. (*Id.* at 327; Boucher Dep. at 17:15-19.)[10]

Because Davis has failed to show that he was treated differently than similarly-situated IDOC inmates based on his identity as a TDF detainee, the court need not assess whether the justification for such disparate treatment could survive strict scrutiny.

## IV.    Budz's Liability for Substantive Due Process Violations

Davis also argues that the Defendants, including Budz, have violated his substantive due process right to fair and reasonable conditions of detention. (Pl.'s Post-Trial Br. at 3, 9.) Civilly committed sex offenders like Davis have a substantive due process right to conditions of confinement that "bear some reasonable relation to the purpose for which persons are committed." *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003) (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)). In order to comply with this standard, a defendant must conclude, in the exercise of professional judgment, that a security procedure "is necessary for the well-being of the detainee (or others) . . . ." *Id.* Although preserving the security of staff and others takes precedence over treatment goals in a SVP program, regardless of whether security measures constitute "treatment," restrictions on a detainee's liberty will nevertheless give rise to liability if the detainee can prove that a "defendant['s] choices exceed the scope of honest professional disagreement" or that they were "designed to inflict extra punishment for the plaintiff['s] sex crimes." *Id.* at 749.

Davis claims that Budz exceeded the permissible scope of professional judgment in the

---

[10]    Davis argues that *Youngberg* "impliedly recognized" that detainees should be compared with prisoners, because that case stated that the involuntarily committed "are entitled to more considerate . . . conditions of confinement than criminals . . . ." 457 U.S. at 321-22. (Pl.'s Post-Trial Br. at 9.) That dictum does not control here, for several reasons. First, *Youngberg* was a substantive due process case, so it would be a mistake to read it as establishing principles of equal protection law. *See id.* at 324. Second, the Court did not make clear in this brief statement *which* criminals were the appropriate subject of comparison. Absent more detailed analysis, it does not appear that the Court meant to propound a rule of law requiring that dangerous psychotics who are civilly committed be confined less restrictively than first-time forgery offenders who are criminally incarcerated.

following ways: (1) by classifying Davis as a maximum-custody inmate, (2) by imposing the universal strip search policy, (3) by imposing the black box policy, and (4) by illuminating Davis's cell during his sleep periods.  (Pl.'s Post-Trial Br. at 9-14.)  The court considers these claims in turn.

A.     *Budz's Liability for Classifying Davis as a Maximum Custody Inmate*

Davis urges, first, that Budz violated his rights by "classifying him as a high-custody charge." (Pl.'s Post-Trial Br. at 9.)  As so characterized, this claim fails in a basic way: there is no evidence that Budz "classified" Davis in any particular way; rather, all the evidence indicates that Davis was subjected to the same security procedures as all other TDF detainees.   To the extent that Davis's complaint is that the security procedures of the TDF were overly stringent in general, the only "classification" creating this situation was the decision by the State of Illinois to petition for Davis's confinement as a sexually violent person.  As there is no evidence linking Budz to that decision, any claim against Budz that is based on Davis's "classification" as a "maximum custody inmate" must fail.

Budz was responsible, in Davis's view, for certain conditions at the TDF that Davis claims were unconstitutionally severe.  If the court views Davis's "classification" claim as a challenge to those conditions, the claim fares no better.  With respect to some of these conditions, such as his deficient access to job opportunities, inadequate commissary facilities, and unsafe drinking water, Davis appears to have abandoned this claim.  (*See* Minute Order [310], 6/19/07, at 1-2.)  Indeed, other than the issue of twenty-four-hour cell lighting, which is discussed below, the lockdown is only other specific condition Davis challenges as part of his "classification" argument.   He alleges that "Defendants locked-down Davis for more than twenty days, not allowing him to shower during that time, even though there was no evidence that he posed a threat to institutional security."  (Pl.'s Post-Trial Br. at 10; Final Pre-Trial Order at ¶ 62.)  This single sentence represents the entirety of Davis's argument on this point; he offered no expert testimony suggesting that a twenty-one-day lockdown following an attempt at organized resistance by a large number of detainees, shortly after the

breakout of several incidents of violence, was outside the bounds of professional judgment.

Davis has neither proved that he was "classified" by Budz as a "high security charge" (Pl.'s Post-Trial Br. at 9), nor proved that the specific conditions he experienced as a result of his alleged "classification" were improper. His "classification" claim is dismissed.

B.    Budz's Liability for the Strip Search Policy

Davis next argues that Budz violated his rights by causing him to be subjected to strip searches, including visual inspections of his body cavities, before and after each of his guest visits and trips to court. (Pl.'s Post-Trial Br. at 10-11.) Budz argues that the decision to implement the strip search policy was within the scope of professional judgment, and that even if it was not, he is entitled to qualified immunity. (Defs.' Post-Trial Br. at 7-8, 12-14.)

Budz did not violate the Constitution by requiring detainees at the Sheridan TDF to be strip searched before and after visits and trips to court. Budz testified credibly that he believed he was required to follow IDOC procedures by the Interagency Agreement, and that he believed that one of those procedures was a rule requiring strip searches before and after visits and travel to and from court. (Tr. at 326-27.) Compliance with an agreement entered into by top DHS officials regarding the management of the TDF cannot be a departure from professional judgment. Davis does not argue otherwise. He asserts, instead, that the policy Budz relies on did not exist, and that if Budz had adequately investigated IDOC policies, he would have learned that it did not exist. (Pl.'s Post-Trial Br. at 11-12.) The evidence Davis offers, however, consists only of a copy of relevant provisions of the Illinois Administrative Code, which make no mention of the matter. (*Id.;* 20 Ill. Adm. Code Subpt. A: Visitation, Pl.'s Ex. 107.) Budz's testimony that the strip search policy was an "unwritten practice" was corroborated by Buscher, who stated at his deposition in 2007 that strip searches had been required within the IDOC before and after visits for the last eighteen years of his

employment.[11]  (Buscher Dep. at 17:15-19.)  Budz believed that he was required to follow this policy while the TDF was situated within the Sheridan Correctional Center, and this belief was reasonable, given the provision of the 1998 Interagency Agreement making DHS employees "subject to all DOC policies and procedures covering operations of the facility."  (Tr. at 326; 1998 Interagency Agreement at 2, Pl.'s Ex. 108.)  Plaintiff, thus, has not satisfied the court that application of the strip search policy to detainees in the Sheridan TDF falls outside the bounds of professional judgment.

The situation changed, however, when the TDF moved to Joliet.  Budz did not believe he was required to strip search Joliet TDF detainees pursuant to any DHS agreements or policies; rather, he made a decision to continue it "for the interim until we become established."  (Tr. at 357.)  This "interim" policy lasted for four years, however.  (Stipulations ¶¶ 28, 39.)  Budz justified the practice on two grounds:  to protect the safety of detainees, staff, and visitors and to prevent the introduction of any contraband into the facility.  (Tr. at 307.)

With respect to searches before trips to court, the rationale is a matter of simple common sense: Detainees are far more likely to engage in successful escapes if they can carry concealed items during their travel to court, as the escape of Runge and Conley demonstrates.  Even Martin, Davis's expert witness, testified that universal strip searches accompanied by visual cavity inspections might be appropriate "when [detainees or inmates] leave the institution and they pass through the civilian personnel and community."  (Tr. at 393-94.)  Likewise, Dvoskin testified that "anytime one leaves the facility . . . they are in the company of staff, and you want to make sure you keep your staff safe."  (*Id.* at 597.)

---

[11]     Peters, who worked for IDOC from 1971 through 1995, testified that, when he was warden at Sheridan and Centralia from 1984 through 1988, strip searches were not a matter of routine.  (Tr. at 202.)  Boucher, by contrast, testified that strip searches were routinely conducted throughout the IDOC from 1988 through 2007.  (Boucher Dep. at 17:15-19.)  Peters, whose tenure as IDOC director is not stated in the records, himself acknowledged that it would have been permissible for individual prisons to implement routine strip search policies while he was IDOC Director, and that he did not know whether or not this had occurred.  (*Id.* at 215-16.)

Nor is the court troubled by the requirement that TDF detainees undergo a strip search upon their return to the institution. Such a practice is closely connected with Budz's articulated goal of keeping contraband out of the TDF facility. Dvoskin specifically testified that such searches were "common" in secure forensic facilities, and Martin did not dispute this. (Tr. at 596-97.) Given the failure of either expert to condemn the imposition of strip searches upon an detainee's return to the TDF, there is no basis on which the court can conclude that this practice violated Davis's rights.

It is a closer question, but the court concludes that Budz's decision to impose strip searches following visits with guests and attorneys was likewise within the bounds of professional judgment. Martin did not specifically testify otherwise; rather, he suggested that it is "simply not done that way"—that is, in a "blanket fashion, irrespective of a confined person's custody, management status, [and] security issues at hand"—but he also indicated that "you would want to look at whether it's a contact or non-contact visit, [as well as] what type of surveillance that you have in your visiting area." (Tr. at 399-400.) Dvoskin, by contrast, testified that universal application of a security policy could be beneficial in that it would reduce friction between detainees and staff. (*Id.* at 593.) Furthermore, he testified that "some places"—presumably other forensic facilities or detention programs—"search on the way back from visits . . . to protect against someone who may have gained contraband during the visit." (*Id.* at 597.) Dvoskin concluded by noting that, although "[he] wouldn't have done it," he believed that strip searching residents before and after visits was within the bounds of professional judgment. (*Id.*) Finally, it should be noted that the IDOC employs a similar policy following visits, even in minimum-security institutions. (Boucher Dep. at 17:15-19, 19:2-9.) Thus, although the practice is certainly an intrusive one, and although reasonable people might disagree as to its appropriateness, the court concludes that it was within the scope of professional security judgment to strip search all residents following visits.[12]

---

[12] Davis argues that the impropriety of strip searches after visits has been clearly
(continued...)

33

The practice of conducting strip searches *before* visits, however, is not so readily justified. Unlike strip searches following a visit, Dvoskin was not aware of any other forensic or other similar facility that strip searched detainees before visits. (Tr. at 597.) In fact, he testified that, in his own experience managing a forensic facility, such a search "would have been a very unusual event that would have definitely been for cause." (*Id.* at 623.) Likewise, Martin made it clear that he could not "see any rational correctional basis to have strip searched [Davis] prior to a visit." (*Id.* at 399.) Indeed, the only concern motivating such searches appears to be a concern that a detainee will bring a weapon into the meeting, and most weapons should be detectable through a pat-down search. It is very hard to see how requiring Davis to pull back his foreskin or expose his anus to view would help protect the safety of visitors. To be sure, there are considerations on the other side of the question; the existence of a contrary policy in the IDOC does suggest that some corrections officials view the procedure as useful. In the absence of a clear articulation by either Budz or an expert witness of why such searches were necessary, however, the court cannot conclude that the decision to require strip searches of all residents before guest visits represents an exercise of professional judgment.

Budz argues that all of the strip searches were proper, citing two cases from other courts in this District. Neither case supports his claim, however. In *Hargett v. Adams*, Judge Leinenweber found that, by substituting the Rapiscan machine for the strip searches at the TDF, the DHS had mooted the detainee plaintiffs' claims to injunctive relief against future strip searches; he did not reach the merits of the constitutional claim. 2005 WL 399300, at *15. In *Lieberman v. Budz*, Judge

---

[12](...continued)
established by a federal district court in Washington State, which issued an injunction against the use of such searches by a SVP program. *See Sharp v. Weston*, 233 F.3d 1166, 1168-69 (9th Cir. 2000) (describing this district court ruling, which is not reported or electronically available, in the background section of a decision on an appeal from a subsequent decision refusing to vacate that injunction). The court is unable to compare the state of the record in this case with the record supporting the other court's injunction, and the reasoning supporting that decision cannot be assessed. In any case, it is not controlling.

Filip ruled that a related claim—that detainees were unduly burdened in their ability to receive visits from family members, in part because of search procedures—had been previously resolved by Judge Leinenweber, and that this judgment was binding as to the plaintiffs in the case before him. *See* No. 03 C 2009, 2007 WL 1810493, at *14 (N.D. Ill. June 19, 2007). Therefore, given the nature of the claims at issue and the procedural posture of these cases, neither judge had any reason to discuss the constitutional validity of the strip search program.

Finally, Davis also argues that the strip searches were improper because he was sometimes viewed by female TDF staff members during such searches. (Pl.'s Post-Trial Br. at 11.) Given the absence of any evidence that Budz knew of, permitted, or encouraged the presence of female security personnel during strip searches, this complaint cannot form the basis of any additional liability for Budz. *See Chavez*, 251 F.3d at 651.

C. *Budz's Liability for the Black Box Policy*

Next, Davis claims that Budz violated the professional judgment rule by requiring him to wear the black-box restraint system on all of his trips to and from court over a fifteen month period. (Pl.'s Post-Trial Br. at 12-13.) Budz once again argues that the imposition of the policy was within the bounds of appropriate professional decisionmaking. (Defs.' Post-Trial Br. at 9-10.)

Budz first argues that the decision was reasonable because he made it in consultation with many other DHS employees and TDF staff members. (Defs.' Post-Trial Br. at 9-10.) The court does not doubt that he consulted with others in making this decision, as he testified. (Tr. at 329-30.) But this does not, by itself, establish that he exercised professional judgment. *See West*, 333 F.3d at 748 (holding that determining whether professional judgment was employed requires an assessment of what a reasonable person could think appropriate from a security perspective).

Budz explained that the main reason for the universal application of the black box was his fear that other inmates might attempt an escape in the wake of Runge and Conley's success. (Tr. at 261.) He was justifiably concerned that other handcuff keys might be in the possession of

detainees. (*Id.*) The black box, being designed to limit the movement of a prisoner's hands and obstruct access to its keyholes, would make a similar escape attempt more difficult, even if it would not make it impossible. (*Id.* at 129, 260.)

Davis seems to concede that the use of the black box was reasonable for some period following the escape; he states in his brief that "the initial application of the device during a short investigation period might comport with accepted professional judgment." (Pl.'s Post-Trial Br. at 13 n.5.) And Martin, Davis's expert, suggested that universal application of the black box would be within the bounds of professional judgment for up to six months following an escape. (Tr. at 400.) Given Budz's legitimate concern about a potential repeat of the Runge and Conley escape, the court concludes that it was within the bounds of professional judgment to apply the black box to all inmates during transport to and from court for a six month period following the escape—that is, until April 10, 2001.

That it was reasonable to impose the black box for a short time, however, does not imply that it was reasonable to impose it permanently. As his rationale for requiring the universal use of the black box system, Budz explained that, despite the staff's failure to locate any additional handcuff keys in the facility, a key or other similar contraband might still have been outstanding, because "a shakedown is not 100% foolproof." (Tr. at 262.) Thus, he testified, the black box was imposed on all detainees because "it was our determination that we would need to make sure there were no future escapes." (*Id.* at 261.)

Significantly, the policy remained in place until just a few weeks before the *Hargett* trial was scheduled to begin. (*Id.* at 262-63.) Budz explained that this change arose "based upon groups of individuals that we believe . . . fell into certain categories that would not necessarily require use of the black box any longer." (*Id.* at 263.) There was no explanation, however, as to why Budz's assessment of the dangerousness of the vast majority of TDF detainees changed so dramatically shortly before that trial, and no documentation of any individualized reassessment has been

provided to this court. The court concludes that Budz was less than credible on this point and that he meant for the black box policy to continue indefinitely, changing course only to avoid liability in the *Hargett* matter.[13]

Budz testified that "[w]e had continued to look at all of our policies . . . at the TDF in a continuous quality-improvement capacity" (Tr. at 333) and also testified that "there were years of discussion" on the subject of the black box (*id.* at 291), but this testimony was less than credible. There was no evidence of any meeting or analyses by TDF staff concerning the wisdom of continuing the policy indefinitely. If any such ongoing discussions took place, it appears that they were limited and informal.

Most troubling, there is no indication that Budz or other TDF staff made any attempt to balance the incremental safety increase brought about by the black box policy against the discomfort it imposed on detainees. Neither expert was aware of any other secured detention facility that universally applies the black box restraint system during detainee transport. (Tr. at 402-03, 624-26.) Indeed, Martin testified that the black box is not universally applied in any of the supermax prisons with which he is familiar, and that it is applied to only about 100 of the 65,000 inmates in the New York state prison system (roughly 0.15% of that population). (*Id.* at 401-02.) Thus, the evidence strongly indicates that the professional community of correctional and forensic officials regards the black box as a highly restrictive device, to be used only on the highest risk inmates or detainees. This does not mean that there could be no reason within the bounds of professional judgment for the universal application of such a device within a TDF facility, but it does mean that such a deviation from accepted norms of detention practice would require special justification.

---

[13] The hiring of Darrell Sanders as the new security chief at the TDF, and his advocacy of less restrictive procedures for TDF inmates, may also have played a role in this reversal. (*See* Tr. at 333, 549-51.) This does not alter the above analysis, however; if anything, it demonstrates more thoroughly that Budz's intention was to maintain the policy, and that if Sanders had not been appointed, or if the *Hargett* matter had not been proceeding to trial, he could well have maintained it for significantly longer than four years.

The evidence in the record, however, does not reflect any such careful consideration. Rather, the black box appears to have been imposed as part of a temporary response to the escape incident, and then retained indefinitely with little (if any) additional inquiry. It is not enough that some hypothetical professional judgment could support a given decision in the civil commitment context; rather, it must also be shown that professional judgment was actually exercised. *See West*, 333 F.3d at 748-49. The court concludes that Budz failed to exercise professional judgment in determining that the highly restrictive black box system would be universally applied to TDF detainees beyond an initial six-month period.

### D. *Budz's Liability for the Nighttime Illumination of Detainees' Rooms*

Davis claims, finally, that Budz did not exercise professional judgment when he required detainees to sleep in rooms that were illuminated by a night light. (Pl.'s Post-Trial Br. at 14-15.) If, as Davis claims, Budz forced him to experience extreme illumination powerful enough to prevent him from sleeping, such a practice might be constitutionally improper if not carefully justified. *See LeMaire v. Maass*, 745 F. Supp. 623, 636 (D. Or. 1990) (holding that exposing prison inmates to constant illumination constituted cruel and unusual punishment, absent a demonstration that such illumination was necessary), *vacated on other grounds*, 12 F.3d 1444, 1458-59 (9th Cir. 1993). Budz contends, however, that the lights were not very bright, and that they were necessary to enable staff to see inside detainee rooms and ensure that the detainees were present in their beds and not engaged in sexual activity. (Tr. at 350; Defs.' Post-Trial Br. at 14.)

He testified, further, that the TDF had purchased night-masks for detainees who complained of difficulty sleeping. (Tr. at 381.) Davis's testimony that he was disciplined for trying to cover his eyes was not credible; in his grievance on this issue, he complained not that he was punished for covering his eyes, but that he was punished for hanging a towel across the opening to his bunk in such a way that it obscured the staff's ability to ensure that he was in his bed at night. (Grievance, 6/21/01, at 1-2, Pl.'s Ex. 92.) That circumstance confirms Budz's testimony regarding the stated

purpose of the night-lighting, and does not rebut Budz's testimony that night masks were available on request.

Given the availability of the night masks, and the absence of any expert testimony that the illumination of cells during the night was outside the bounds of professional judgment, the court concludes that the night lights did not violate Davis's rights.

E.    Qualified Immunity

Budz argues that if he is entitled to qualified immunity. (Defs.' Post-Trial Br. at 7.) Qualified immunity shields government officials from individual damages liability for the performance of discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). Officials will not be entitled to qualified immunity if they knew, or should have known, that their actions would violate the plaintiff's constitutional rights. *Id.*

In *West*, decided in 2003, the Seventh Circuit held that qualified immunity would not shield officials managing an SVP program if those officials imposed restrictive conditions on detainees that could not be justified on either security or treatment grounds. 333 F.3d at 748. The court noted, moreover, that the Constitution required that "medical judgment be exercised." *Id.* at 749.

Budz attempts to shield himself from liability by showing that there was no Seventh Circuit caselaw holding that policies similar to those challenged here were unconstitutional, and by pointing to some cases upholding similar practices in response to slightly different constitutional challenges. (Defs.' Post-Trial Br. at 7.) *See, e.g., Thielman v. Leean*, 282 F.3d 478, 484 (7th Cir. 2002) (holding that Wisconsin SVP detainee did not have a state-created, *procedural* due process liberty interest in not being restrained using the black box system). The professional judgment standard is not, however, a list of procedures that are justifiable and procedures that are not. Rather, the professional judgment standard gave Budz wide latitude with regard to the practices and procedures he implemented at the TDF, so long as he did exercise considered professional judgment in determining what procedures to employ. *West*, 333 F.3d at 749. The flip side of this wide latitude,

however, is that if he failed to exercise professional judgment, Budz does not shield himself by protesting that his specific choices were not previously found to be improper by the courts. *Id.* (holding that, in managing SVP detainees, "there is room for both disagreement and trial-and-error; all the Constitution requires is that punishment be avoided and medical judgment be exercised"). Therefore, Budz is not entitled to qualified immunity against Davis's claims.

## V.  Appropriate Damages

Davis asks for $750,000 in damages as a result of being forced to wear the black box and being strip searched.  (Pl.'s Post-Trial Br. at 20.)  He makes no attempt to show how such damages could be justified based on the evidence at trial, however.  Budz argues that no damages should be awarded, but he makes no attempt to quantify Davis's injuries.  (Defs.' Post-Trial Br. at 21.)

The court has determined that Budz is liable to Davis for improperly strip searching him before visits with attorneys and other guests.  This liability covers strip searches that occurred from the time Budz chose to impose strip searches before visits in the Joliet TDF (around March 2000), until the installation of the Rapiscan machine in September 2004, when Budz was no longer requiring routine strip searches at the TDF.

Davis, unfortunately, has not offered much evidence regarding the frequency with which he was searched prior to visits.  More importantly, he has offered no evidence as to how often he was searched before visits at the Joliet TDF, or indeed, if he was ever subject to such a search at that facility.  In the absence of such proof, the court has no basis for an award of compensatory damages.  *See Burns v. Head Jailor of LaSalle Cty. Jail*, 576 F. Supp. 618, 620 (N.D. Ill. 1984) (holding that § 1983 does not authorize an award of purely speculative damages; actual proof of harm is required).

With regards to the black box claim, the court has found that Davis was forced to wear the

black box on four trips to court between April 10, 2001[14] and January 7, 2002. During this time, he was able to take off the black box while at the Madison County Courthouse, meaning that he was able to urinate and eat his lunch. As discussed previously, the court finds that the addition of the black box to Davis's usual restraints (handcuffs, a waist-chain, and leg-irons) caused him to suffer from chafed and swollen wrists, as well as sore arms and shoulders due to his arthritis.

The court has also found that, between April 11, 2001 and January 7, 2002, Davis's four court trips lasted a combined total of 40.75 hours. Given that Davis was able to remove the black box during the time he was at the courthouse, this time will not be counted in calculating his damages. Davis has not offered evidence as to how long this period of time typically was, however. Assuming that an average writ included one hour of court time, the court finds that Davis spent a total of 36.75 hours wearing the black box during the period over which he is entitled to damages.

Given that Davis was already subject to significant restraint during his travels, the additional harm of wearing the black box was modest. For this reason, the court finds that Davis is entitled to thirty dollars for each hour he wore the black box between April 11, 2001, and January 7, 2002. Accordingly, Budz is liable to Davis for a total sum of $1,102.50 in compensatory damages.

## CONCLUSION

For the reasons explained above, the court finds in favor of Davis in his claim against Budz, and awards Davis $1,102.50 in compensatory damages. Regarding Davis's remaining claims, the court finds against Davis, and in favor of Peters and Baker. Davis's claims against Defendants Monahan and Adams are dismissed.

ENTER:

_Rebecca R. Pallmeyer_

---

[14] April 10, 2001 is six months after October 10, 2001, the date on which Budz implemented the black box policy. The court has previously concluded that imposition of the black box on a universal basis over a six-month period was within the bounds of professional judgment.

41

Dated:  June 27, 2008

_____
REBECCA R. PALLMEYER
United States District Judge